# United States District Court
## for the Northern District of Oklahoma

Case No. 24-cr-131-JDR-8

UNITED STATES OF AMERICA,

*Plaintiff,*

*versus*

ROSA MARIA OLMOS, *et al.*,

*Defendant.*

## OPINION AND ORDER

During a surveillance operation, police officers separately observed two cars, a Chevrolet Tahoe and an Acura sedan, engaged in suspected drug transactions. The Tahoe and the Acura were later identified as belonging to Rosa Olmos. Officers then observed one of these cars parked daily (overnight and early in the morning) in the driveway of 3512 East Vail Street, Broken Arrow, Oklahoma. Based on this and other information, Officer Anthony Finnegan with the DEA Tulsa Resident Office authored a supporting affidavit for a search warrant application. Officers then obtained a warrant to search the Vail Street residence. There, police officers discovered evidence connecting the home to a drug conspiracy, including U.S. currency and a handgun. Additionally, the police officers interviewed Ms. Olmos, who was present at the home during the search. In the course of that interview, Ms. Olmos made statements against her interest.

No. 24-cr-131

Ms. Olmos now seeks to suppress her statements, along with all other evidence discovered during the search. She claims that the application for the search warrant failed to establish probable cause to believe that the Vail Street home was connected to a drug conspiracy. Accordingly, Ms. Olmos contends that any evidence resulting from the execution of the warrant cannot be considered at trial. Dkt. 155 at 2–3.[1] For the following reasons, Ms. Olmos's motion to suppress is denied.

I

During a lawful surveillance operation of codefendant Gabriel Urquiza-Urquiza, also known as Gabriel Urquiza-Flores, officers established a connection between him and a drug trafficking organization.[2] On March 16, 2024, officers intercepted a call in which an unidentified male instructed Mr. Urquiza-Urquiza to meet a courier at a car wash to pick up $11,500. Dkt. 155-2 at 15. Officers then observed a man matching Mr. Urquiza-Urquiza's description enter a maroon Dodge Ram. *Id.* The officers established physical surveillance of the car wash identified in the call and monitored GPS data from a court-authorized tracking device affixed to the Dodge Ram as it travelled to the car wash. *Id.* Officers observed the Dodge Ram as it arrived and parked at the car wash. *Id.* Soon after, a tan Chevrolet Tahoe with license plate CZD010 parked near the Dodge Ram. *Id.* at 16. Officers observed Urquiza-Urquiza leave his vehicle, walk to the driver's door of the Chevrolet Tahoe, then return to his car before leaving the car wash's parking lot. *Id.*

---

[1] All citations utilize CMECF pagination.

[2] Throughout the officers' investigation, police officers overheard calls about dropping money and drugs. Specifically, a confidential source made two controlled pickups from Urquiza-Urquiza in the amounts of $80,000 and $60,005. Dkt. 155-2 at 11. Intercepted audio calls from authorized wiretaps show that Urquiza-Urquiza was directed to deliver $25,000 to a courier in connection with the transportation of 25 kilos of methamphetamine. *Id.* at 12.

No. 24-cr-131

Officers later discovered that the tan Chevrolet Tahoe's license plate was registered to Ms. Olmos.[3] *Id.*

After the meeting, the officers followed the Tahoe to a residential neighborhood, but the officers were unable to maintain surveillance of the car. *Id.* Five minutes after losing sight of the Tahoe, officers located the car parked at a house at 13037 East 46th Street. *Id.* The property records show that this house was owned by a trust in Ms. Olmos's name. *Id.*

On March 23, 2024, officers intercepted a call from Urquiza-Urquiza to an unidentified man. Dkt. 155-2 at 17. During the call, the unidentified man said he would request for an unidentified female to pick-up $7,000 in Oklahoma City after picking up a "vehicle loaded with firearms from Urquiza-Urquiza." *Id.* The next day, officers observed via electronic surveillance as Urquiza-Urquiza left his home. *Id.* GPS data showed Urquiza-Urquiza's car drove to a Dollar General where officers physically observed his car as it backed into a parking spot. *Id.* at 17–18. A brown Chevrolet Tahoe then pulled partially into the neighboring parking spot, aligning the driver's side windows of both cars. *Id.* at 18. Shortly thereafter, the Tahoe left the parking lot. *Id.* Although officers did not ascertain the entire license plate number, the beginning letter of the brown Chevrolet Tahoe matched the beginning letter of the tan Chevrolet Tahoe registered to Ms. Olmos.[4] *Id.*

About two weeks later, two women in a white Dodge Challenger drove to and entered an apartment connected to the Urquiza-Urquiza drug

---

[3] The license plate CZD010 was registered to Ms. Olmos and one other person. Dkt. 155-2 at 21.

[4] There does not appear to be any dispute that the same vehicle was involved in both transactions, even though the Chevrolet Tahoe was described as both tan and brown. The license plate for the tan Chevrolet Tahoe observed at the car wash was CZD010. Dkt. 155-2 at 16. The brown Chevrolet Tahoe observed at the Dollar General had a license plate number with the letter "C" as the first character. *Id.* at 18.

conspiracy.[5] *Id.* at 19. Half an hour later, the white Dodge Challenger left the apartment complex and officers maintained physical and electronic surveillance of the car as it drove to a Dollar General. *Id.* at 20. There, one woman[6] got out of the car and got into a silver Acura sedan, which was later identified as being registered to Rosa Olmos. *Id.* at 21. The Acura left the Dollar General parking lot. *Id.* Police officers later observed the silver Acura sedan parked in the driveway of 3512 East Vail Street, Broken Arrow, Oklahoma. *Id.* Physical surveillance and data from a license plate reader also consistently placed the Acura at the Vail Street house late at night and early in the morning in April of 2024.[7] *Id.* at 21, 23.

Based on the described activities and Officer Finnegan's experience and knowledge as a law enforcement officer, Officer Finnegan believed there

---

[5] The Officers had previously observed Leticia Garcia-Salazar coming and going from the same apartment (7215 S 92nd East Ave, Apt. 2). Dkt. 155-2 at 12. Through electronic surveillance, officers once observed Garcia-Salazar move a tote from that apartment to her car's trunk. *Id.* at 12-13. Officers tracked the car's location through GPS data before physically observing a man moving the tote from Garcia-Salazar's car into his own. *Id.* at 13. During a traffic stop of the man's car, officers gained access to the tote and conducted a field test of the substance within it. *Id.* at 14. The substance "tested presumptive positive for methamphetamine" and weighed about 32 kilograms. *Id.* at 14–15.

[6] Officers observed that the woman's height and build matched the description of Rosa Olmos but could not make a positive identification. Dkt. 155-2 at 21. Because officers could not positively identify Ms. Olmos, the Court does not consider the matching description in its analysis.

[7] Officers had GPS data linking the silver Acura sedan to the Vail Street house. However, Ms. Olmos questions whether a warrant existed for this GPS data and the government does not respond to the inquiry. Because sufficient evidence supports the Court's conclusion without the GPS data, the Court declines to consider that data in its evaluation of the warrant and does not address whether placement of the GPS device itself was constitutional. *See, e.g., United States v. Bullcoming*, 22 F.4th 883, 892 (10th Cir. 2022) (finding information in the affidavit sufficient to establish probable cause even without the information obtained from challenged searches); *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005) (recognizing that a warrant "tainted by some unconstitutionally obtained information" may be upheld if probable cause still exists without that information).

No. 24-cr-131

was probable cause to connect the Vail Street home to the Urquiza-Urquiza drug conspiracy. Officers obtained a search warrant for the property. When officers knocked on the door of the Vail Street home, Ms. Olmos answered the door. *See* Dkt. 155 at 1–2; Dkt. 163 at 7. Given her presence at the house at the time the search warrant was executed, officers Mirandized and interviewed Ms. Olmos. Dkt. 161 at 1. During the interview, she made statements against her interest.[8]

## II

Ms. Olmos argues that all evidence and statements resulting from the execution of the search warrant were obtained in violation of the Fourth Amendment and are, therefore, inadmissible at trial. Dkt. 155 at 2–3. Specifically, she claims the affidavit for the search warrant was "so deficient in supporting facts to be devoid of probable cause." *Id.* at 2. She contends that the affidavit lacked probable cause because it does not positively identify Ms. Olmos and because it relies on public databases for evidence. *Id.* at 4.

For its part, the government argues that the affidavit presents sufficient facts to establish probable cause connecting the Vail Street house to a drug conspiracy. Dkt. 163 at 2. The government further argues that regardless of Ms. Olmos's own presence or participation in any of the suspected activities, two cars registered in her name are sufficiently connected to a drug conspiracy, and one of those cars consistently parked in the driveway of the Vail Street house. *Id.* at 9. The government asserts that these facts, standing alone, are sufficient to establish probable cause that someone involved in the drug conspiracy resided at the Vail Street house. *Id.*

---

[8] Ms. Olmos seeks to suppress the statements based on her contention that the search warrant's insufficiencies should invalidate any evidence resulting from its execution, including the interview. She does not challenge admission of the interview statements on any other basis.

No. 24-cr-131

### III

A search warrant may authorize the search of a suspect's home if there is probable cause to believe that the search will yield "(1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." Fed. R. Crim. P. 41(c), (d). Probable cause exists only where there is a "nexus between suspected criminal activity and the place to be searched." *United States v. Biglow*, 562 F.3d 1272, 1278 (10th Cir. 2009) (citing *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990)). The Court should only suppress evidence seized during an authorized search "if the affidavit supporting the warrant application provides 'no substantial basis for concluding that probable cause existed.'" *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).

The affidavit sets forth a series of facts that, when taken as a whole, establish a connection between the Vail Street house and a drug trafficking operation. Whether Ms. Olmos was the driver or not, someone drove cars registered to Ms. Olmos to multiple suspected drug conspiracy meetings. *See* Dkt. 155-2 at 16, 18, 21. These facts sufficiently connect the driver of Ms. Olmos's cars to the drug conspiracy. *See United States v. Sanchez*, 555 F.3d 910, 913-14 (10th Cir. 2009) (finding that, for the purposes of a warrant affidavit, informant statements, intercepted phone calls and a then-unknown man's subsequent presence at drug buys sufficed as evidence that the man was a drug supplier). Because a car connected to a suspected drug conspiracy was consistently parked in the driveway of the Vail Street home, it is reasonable to conclude that the driver of that car resided at that address. *See United States v. Sparks*, 291 F.3d 683, 689 (10th Cir. 2002) (finding sufficient evidence that defendant lived at the address because defendant was spotted there on a regular basis and listed the address on his driver's license).

Further, as stated in the affidavit, Officer Finnegan knew from his training and experience that people involved in drug trafficking keep information, currency, and other items connected to the drug trade in their homes. Dkt. 155-2 at 6–7. This observation provides the "additional evidence" to connect the Vail Street home to the suspected drug trafficking. *See Biglow*, 562 F.3d at 1283 (noting that the Special Agent's observation that drug dealers keep evidence in their homes sufficed as "additional evidence" to establish the required nexus); *Sanchez*, 555 F.3d at 912 (holding a search warrant lawful despite the affidavit's lack of direct evidence of criminal conduct at the house).

The affidavit provided sufficient evidence to establish a nexus between Ms. Olmos's cars, the home on Vail Street, and a drug conspiracy. Because of the connection to her cars and property, Ms. Olmos's actual presence at the Vail Street home is not pertinent to the warrant's sufficiency. *See United States v. Diaz-Castrejon*, No. 23-CR-073-JFH, 2023 WL 3095565, at *3 (N.D. Okla. Apr. 26, 2023) (unpublished) (holding that whether defendants resided at the residence in question or not, the residence itself had sufficient connections to drug trafficking to create a nexus). Had someone other than Ms. Olmos answered the door at the time of the warrant's execution, officers would still have had sufficient probable cause to search the home.

Evidence from an authorized search should only be suppressed where a warrant application provides no substantial basis for the magistrate to conclude probable cause existed. *Roach*, 582 F.3d at 1200. Here, reasonable inferences establish a nexus between the suspected drug conspiracy and the Vail Street home, creating a substantial basis for probable cause. Ms. Olmos's motion to suppress [Dkt. 155] is, therefore, denied.

Dated this 25th day of February 2025.

No. 24-cr-131

_____
JOHN D. RUSSELL
*United States District Judge*